# IN THE COURT OF APPEALS OF IOWA

No. 16-1267
Filed September 28, 2016

**IN THE INTEREST OF A.B.,**
**Minor Child,**

**D.B., Father,**
     Appellant.

_____

Appeal from the Iowa District Court for Dallas County, Virginia Cobb, District Associate Judge.

A father appeals the modification of a dispositional order placing his seven-year-old son in the custody of a paternal aunt. **AFFIRMED.**

Jesse A. Macro, Jr., of Macro & Kozlowski, L.L.P., West Des Moines, for appellant father.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Kayla A.J. Stratton of the Juvenile Public Defender's Office, Des Moines, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

A father appeals the modification of a dispositional order in a child-in-need-of-assistance (CINA) proceeding placing his seven-year-old son, A.B., with a paternal aunt. The father contends the State did not show by clear and convincing evidence he violated an order in the original CINA adjudication prohibiting contact between his former paramour and A.B. The father further argues the juvenile court did not make the least-restrictive disposition in removing A.B. from his home and contends removal was not in A.B.'s best interests. Because we agree with the juvenile court that placing A.B. in his aunt's custody was necessary to protect the child from harm considering all the circumstances of the case, we affirm.

## I.      Facts and Prior Proceedings

The Iowa Department of Human Services (DHS) first became involved with A.B. and his parents after his mother was charged with domestic assault against his father in late December 2015. The mother stabbed the father in the arm with a kitchen knife during an argument about the father's relationship with Victoria, a former girlfriend who was pregnant with his child.[1] The struggle took place in the family's home, and A.B. witnessed the fight start before seeking refuge in a nearby bathroom. After the mother's arrest, the court issued a no-contact order between the mother and father.

Because of A.B.'s exposure to domestic violence, the State initiated a CINA proceeding. On April 11, 2016, after a hearing on the matter, the juvenile

---

[1] A.B.'s parents engaged in a pattern of domestic violence. Both the mother and father had previously been charged with domestic assault against the other.

court adjudicated A.B. as a CINA under Iowa Code section 232.2(6)(c)(2) (2015).[2] The court placed A.B. in the father's custody and allowed the mother visitation at the DHS's discretion. The court also ordered the father not to allow Victoria, who had previously had her parental rights to three children terminated, to "be around the child or reside in the family home."[3]

Although the mother and father abided by the no-contact order, their disputes continued. And unfortunately they placed A.B. at the center of their conflict. The two disagreed about the timing and extent of the mother's visitation with A.B. According to Sheila Aunspach, the DHS worker assigned to the case, the father exhibited "controlling" behavior regarding the mother's visits and sought to restrict them. Similarly, the mother was inflexible when the father would request scheduling changes. Aunspach also expressed concern about the conversations the father had with A.B. concerning his mother. Aunspach testified the father told her, in A.B.'s presence, that the mother tried to kill the father. And both parents used A.B. in attempts to uncover incriminating evidence about the other. Aunspach noted the father "will question [A.B.] about time at his mom's home in regard to mom's boyfriend. [The mother] looks [A.B.] over for bruises and marks and asks what happened. . . . [Family, Safety, Risk, and Permanency] reports [A.B.] is very aware of what is going on and why the

---

[2] A child is adjudicated CINA under section 232.2(6)(c)(2) if the child has "suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child."

[3] The DHS caseworker Sheila Aunspach testified: "I'm concerned if Victoria is not able to take care of her own child that she should not be left in a position to be allowed to care for another child. There's also I believe some unresolved mental health concerns as well." Aunspach also testified she was aware of a history of domestic violence between the father and Victoria, including nearly two dozen police calls to the residence where they lived together.

parents are questioning him." A.B. became "very guarded" when speaking about his parents and reported reoccurring nightmares about them. He struggled in school both academically and behaviorally. Aunspach testified the father was supposed to set up Behavior Health Intervention Services (BHIS) for A.B.

On June 6, 2016, the father filed a pro se motion with the court, asking to modify the adjudication order to allow Victoria to have contact with A.B. Shortly thereafter, the State sought to change A.B.'s placement, alleging the father allowed Victoria to spend time with and supervise A.B. The juvenile court held a hearing to consider both matters.

At the hearing, family consultant Mackenzie Alstott testified A.B. informed her—and Victoria later confirmed—that Victoria babysat A.B. at least once while the father was at work and that A.B., the father, and Victoria had ridden together for a previous court date in May. Aunspach testified the father's sister also reported seeing them in a car together on the May court date.

The father denied allowing any contact between A.B. and Victoria, claiming Victoria fabricated the story to punish him. The father similarly disputed A.B.'s report, commenting: "He says a lot of things." Yet despite his claims of Victoria's dishonest and unbalanced behavior, the father still urged the court to terminate the no-contact order, stating he believed Victoria was a mother figure in A.B.'s life who posed no threat to A.B.'s safety.

The juvenile court determined the father had permitted contact between Victoria and A.B. in violation of its no-contact order and both parents had caused A.B. "mental stress . . . by putting him in the middle of their adult issues." Based on these findings, the juvenile court granted the motion to modify and placed A.B.

with his paternal aunt in accordance with the DHS's recommendation. The father now appeals.

## II.    Scope and Standard of Review

We review CINA proceedings de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). Although we are not bound by the fact-findings of the juvenile court in our review, we do give them weight. *Id.* The best interests of the child are our primary concern. *Id.* Evidence must be clear and convincing to support the CINA determination. Iowa Code § 232.96(2). Evidence is clear and convincing when there are no serious or significant doubts as to the correctness of conclusions of law drawn from the evidence. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

## III.    Analysis

Iowa Code section 232.103(4) allows the juvenile court to modify a CINA dispositional order upon good cause for several reasons, including when "[t]he purposes of the order cannot reasonably be accomplished." Iowa Code § 232.103(4)(b). As in the original adjudication, the juvenile court is required to "make the least restrictive disposition appropriate considering all the circumstances of the case." *Id.* § 232.99(4). Transferring custody of the child from a parent is the most restrictive option available to the juvenile court. *See id.* § 232.99(4), .102. The court may do so only if it "finds clear and convincing evidence that . . . [t]he child cannot be protected from some harm which would justify the adjudication of the child as a [CINA]." *Id.* § 232.102(5)(a)(2). The court must also determine "continuation of the child in the child's home would be contrary to the welfare of the child." *Id.* § 232.102(5)(b).

The father argues the State failed to prove by clear and convincing evidence he violated the no-contact order concerning Victoria. We disagree. Three different individuals reported the father allowed contact between A.B. and Victoria in contravention of the court's directive. Although the father disputed these accounts, we find his protest unconvincing, particularly considering the force of the testimony to the contrary and the father's own inconsistent characterization of Victoria. Accordingly, we find the State presented clear and convincing evidence showing the father violated the no-contact order by allowing Victoria to interact with A.B.

The father also argues that by modifying A.B.'s placement the juvenile court failed to reach the least restrictive disposition and contends removal was not in A.B.'s best interests. The father emphasizes he had taken several positive steps towards fulfilling the directives set forth in the court's dispositional order at the time of the modification.

In considering the totality of the circumstances, we find the transfer of custody to his aunt was necessary to protect A.B. from further harm. We acknowledge the father complied with some of the court's directives but agree with the juvenile court that he "dragged his feet on a number of important issues," including failing to timely secure a new individual therapist for A.B. or to set up BHIS services for him. These concerns—in conjunction with the father's disregard of the no-contact order with Victoria and the toxic environment posed by the continuing conflict between the father and mother—warranted modification of the disposition. We agree with the juvenile court that both parents had been putting A.B. "in the middle of their adult issues." A.B. was painfully aware of his

parents' antagonistic behavior and suffered stress as a result.  Because of the adverse effects on A.B.'s well-being from remaining in his father's custody, we find the transfer was in his best interests.

Accordingly, we find the juvenile court properly transferred custody of A.B. to his aunt.  We affirm the juvenile court's order.

**AFFIRMED.**